UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

Case No. _____ -Civ-_____

| | |
|---|---|
| KIP LAMAR SNELL, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) ) ) |
| ALLIED MARINE, INC., DENISON YACHTS INTERNATIONAL, LLC, GALATI YACHT SALES, LLC, HMY YACHT SALES, INC., INTERNATIONAL YACHT CORPORATION, MARINEMAX, INC., MARINEMAX EAST, INC., SHARON & JACK MALATICH LLC, D/B/A S&J YACHTS, NORTHROP & JOHNSON YACHTS-SHIPS, LLC, RICK OBEY YACHT SALES LLC, OCEAN INDEPENDENCE YACHTS, LLC, ONEWATER MARINE INC., R.J.C. YACHT SALES, INC., UNITED YACHT SALES, LLC, WORTH AVENUE YACHTS, LLC, BOATS GROUP, LLC, PERMIRA ADVISERS LIMITED, PERMIRA ADVISERS LLC, INTERNATIONAL YACHT BROKERS ASSOCIATION, INC., F/K/A FLORIDA YACHT BROKERS ASSOCIATION, YACHT BROKERS ASSOCIATION OF AMERICA, INC., and YATCO, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |
| _____ ) | JURY TRIAL DEMANDED |

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT

Case No. _____ -Civ-_____

1.      Plaintiff Kip Lamar Snell ("Plaintiff"), brings this action on behalf of himself and on behalf of the Class consisting of all persons who listed vessels on certain Multiple Listing Services ("MLSs") using a listing agent or broker affiliated with one of the Broker Defendants named herein and paid a buyer's broker's commission from March 22, 2020, until the present ("the Class Period").

2.      Defendants are boating brokerages, MLSs, and yacht broker associations, each of which reside in or have significant presence in this District and nationwide.  Together and along with other unnamed co-conspirators, Defendants have conspired to require boat sellers to pay a commission to the broker representing the buyer of their boats in violation of federal antitrust law.

3.      Plaintiffs seek treble damages under federal antitrust law, injunctive relief, and the costs of this lawsuit, including reasonable attorneys' fees, and demand a trial by jury.

4.      Based upon information and belief and the investigation of counsel, Plaintiff alleges as follows:

**NATURE OF THE ACTION**

5.      Plaintiff brings this class action against Defendants for agreeing, combining, and conspiring to adopt, impose, and enforce an anticompetitive restraint that requires yacht sellers to pay a brokerage fee to the buyer's broker and a total aggregate commission fee that is inflated as a condition for selling their yachts.

6.      Most pre-owned boats and yachts are sold in the United States much like homes are sold in the United States.  They are listed on a MLS.  They are listed by the seller's broker (the "Listing Broker").  The aggregate commission on the sale is typically 10% of the sales price – called "the norm" internally within the yacht broker community – and is paid by the seller at the

Case No. _____ -Civ-_____

time of the closing. If the buyer is represented by a broker (the "Selling Broker"), the commission is shared by the Listing Broker (*i.e.*, the seller's broker) and the Selling Broker (*i.e.*, the buyer's broker), typically on a 60/40 or 50/50 split.  The brokers' collective commissions are always paid by the seller.[1]

7.     Only boat brokers are able to list boats and yachts for sale on the MLSs. Those MLSs will not accept listings from boat owners who want to sell their vessels themselves, known as For Sale by Owners ("FSBO").  Most larger boats and yachts sold on those MLSs are subject to a standard listing agreement (the "Central Listing Agreement").

8.     Central Listing Agreements are standardized forms with terms and conditions provided by national trade associations, including the Yacht Brokers Association of America, Inc. and the International Yacht Brokers Association, Inc., for boat brokers to use.  Those agreements generally require the seller's broker to make a non-revocable offer of compensation, referred to at times as a "co-brokerage agreement," to the buyer's broker, who can be referred to as a "cooperating broker" – in all material ways, the same fundamental construct as the residential real estate market.

9.     Some of the MLSs were founded or are owned by yacht broker associations; others are independent but influenced by boat brokers who are also members of the yacht broker associations.  Therefore, in either case, the large boat brokerage firms, whether through their membership in and influence on the yacht broker associations or through their participation in the MLSs, have contributed to the creation and/or maintenance of an anticompetitive agreement that

---

[1]   As referenced herein, "Listing Broker" and "seller's broker" are synonymous.  Likewise, "Selling Broker" and "buyer's broker" are synonymous.

Case No. _____ -Civ-_____

establishes the ground rules for the sale of a substantial number of pre-owned boats and yachts in the United States (and elsewhere).  As a result of that anticompetitive agreement, boat owners who sell their boats through a participating MLS end up paying the buyer's broker as part of a commission rate, which is inflated by Defendants' anticompetitive conduct, and also pay an overall commission fee that is inflated.

10.     Broker Defendants require their brokers to list their customers' boats and yachts for sale on these MLSs.

11.     The economic reality is that buyers' brokers are financially incentivized to show these buyers boats and yachts where the broker will earn standard – and inflated – commission rates of 4% -5% through co-brokerage transactions.  Thus, most buyers' brokers either will not show their clients listings offering a lower commission rate to the buyer broker or will show listings offering higher commission rates first, while working cooperatively with sellers' brokers to maximize their collective commissions

12.     Because of the dominance of the yachting MLSs, boat owners who want to sell their larger boats or yachts are severely disadvantaged if they do not list their boats for sale on the MLSs.  To list on those MLSs, they have to sign a Central Listing Agreement with a broker and the vast majority of boats sold on those MLSs are sold through Central Listing Agreements requiring co-brokerage terms; that is, Central Listing Agreements whereby the seller commits to pay a commission to the broker representing the buyer even though the interest of the buyer is opposed to the sellers.  The upshot is that  sellers of valuable pre-owned boats and yachts pay a commission to the buyer's broker and also a total commission rate higher than they would absent the anticompetitive conduct of the MLSs, yacht broker associations, and brokers who have

- 3 -

Case No. _____ -Civ-_____

conspired to create and or maintain systems whereby the rules imposed by the key yacht broker associations and MLSs require owners to sign a Central Listing Agreement agreeing to pay a commission to buyers' brokers as part of those Central Listing Agreements in order to sell their boats and yachts.

13.     Because of Defendants' conduct, this anticompetitive system has remained entrenched even as pre-owned boat and yacht buyers increasingly look for and find yachts themselves on yachting MLSs, with buyers' brokers doing correspondingly less work.

14.     Because the price of larger boats and yachts has increased faster than the rate of inflation in recent years, and because buyer broker commissions are set under co-brokerage agreements as a percentage of the sales price of a vessel, the commissions paid by sellers to buyer brokers, and the overall commissions paid by sellers have also increased faster than the rate of inflation in recent years.

15.     Billions of dollars of boats and yachts are sold each year in the United States, and as a result of collusive, anticompetitive conduct among boating MLSs, yacht broker associations, and large boat broker firms, boat owners pay hundreds of millions of dollars in, supracompetitive, inflated commissions every year.

## JURISDICTION AND VENUE

16.     The Court has federal question jurisdiction pursuant to 28 U.S.C. §§1331 & 1337. This case arises under §1 of the Sherman Antitrust Act, 15 U.S.C. §1 and §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§15, 26.

- 4 -

Case No. _____ -Civ-_____

17.     This Court also has subject matter jurisdiction under 28 U.S.C. §1332(d)(2), because the Classes contain more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of each Class is a citizen of a state different from Defendants.

18.     Venue is proper in this District under 28 U.S.C. §1391(b), (c), and (d).  Each Defendant transacted substantial business, was found, had agents, and/or resided in this District; a substantial portion of the events giving rise to Plaintiff's claim took place in this District; and a substantial portion of the conduct alleged here that impacted interstate commerce and trade arose in this District.

19.     This Court has personal jurisdiction over Defendants, each of which has: (a) transacted substantial business in the United States, including in this District; (b) transacted business with members of the Class throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and (d) committed substantial acts in furtherance of their unlawful scheme in the United States, including in this District.  Under 15 U.S.C. §22, which allows for nationwide service of process in federal antitrust actions, this Court has personal jurisdiction over  Defendants.

20.     This Court also has personal jurisdiction against the Florida Defendants under Fla. Stat. §48.193 and for all other Defendants under Fla. Stat. §48.193 because as alleged here, among other things, Defendants: operated, conducted, engaged in, or carried on a business or business venture in this state or had an office or agency in this state; committed tortious acts within the State of Florida; caused injury to persons or property within the State of Florida arising out of an act or omission by  Defendants outside this state; and engaged in solicitation or service activities within this state.

Case No. _____ -Civ-_____

21.     Each Defendant has received revenue attributable to business transacted in Florida, and in this District from the brokerage operations of their respective subsidiaries, franchisees, affiliates, and/or transaction counterparts that transact business in Florida and in this District.

## PARTIES

**Plaintiff**

22.     Plaintiff Kip Lamar Snell, a natural person and a resident of the State of Alabama, entered into a Central Listing Agreement with Galati Yacht Sales, LLC, to sell a 41-foot 2003 Express Cruiser Sea Ray that required a commission of 10% of the gross sales price of the vessel, which would include the commission paid to the buyer's broker.  Plaintiff's vessel was sold and he paid the commission on the transaction, including the commission paid to the buyer's broker.

**Broker Defendants**

23.     Defendant Allied Marine, Inc. ("Allied Marine") is a yacht brokerage based in South Florida.  It regularly sells yachts in Florida, earns substantial brokerage commissions on yachts sold in Florida, has agents in Florida, and advertises in Florida.  It specializes in brokering vessels 50 to 100 feet.  It also has a superyacht division specializing in larger yachts.  It is the exclusive U.S. East Coast dealer for new Ferretti Group yachts, including Ferretti Yachts, Riva, Pershing, Itama, and Mochi Craft.  Allied Marine is owned by Ferretti Group. Ferretti S.p.A., an Italian multinational shipbuilding company headquartered in Forlì, specializes in the design, construction, and sale of luxury motor yachts.  Ferretti announced that in 2023 its valuation surpassed 1 billion euros.

24.     Defendant Denison Yachts International, LLC, which operates under several names, Denison Yacht Sales, Inc., Denison New Yachts, LLC, and Denison Yachting,

Case No. _____ -Civ-_____

(collectively, "Denison Yachting") is a yacht brokerage that is incorporated in Florida with its headquarters in Fort Lauderdale, Florida.  Denison Yachting regularly sells yachts in Florida, has agents in Florida, collects substantial brokerage commissions from yachts sold in Florida, and advertises in Florida.

25.     Defendant Galati Yacht Sales, LLC ("Galati") has been in business since 1970 and is one of the largest privately-owned yacht brokerages and dealerships in the world.  Galati regularly sells yachts in Florida, has agents in Florida, collects substantial brokerage commissions from yachts sold in Florida, and advertises in Florida.  Galati has six Florida offices, in Anna Maria, Destin, Sarasota, Fort Lauderdale, Tampa Bay and Naples.

26.     Defendant HMY Yacht Sales, Inc. ("HMY") is a yacht brokerage. HMY regularly sells yachts in Florida, has agents in Florida, collects substantial brokerage commissions from yachts sold in Florida, and advertises in Florida.  HMY's principal place of business is in Palm Beach Gardens, Florida.

27.     Defendant International Yacht Corporation ("IYC") is a yacht brokerage based in Fort Lauderdale, Florida. IYC regularly sells yachts in Florida, has agents in Florida, collects substantial brokerage commissions from yachts sold in Florida, and advertises in Florida. IYC claims it has consistently ranked within the Top 3 companies in luxury yacht sales globally.  In 2023 IYC reported $7.2 billion in sales and over 800 yachts sold that year.

28.     Defendant MarineMax, Inc. is a publicly traded company, under the ticker symbol HZO, based in Florida, and touts itself as the world's largest recreational boat and yacht retailer. MarineMax, Inc. regularly sells yachts in Florida, has agents in Florida, collects substantial brokerage commissions from yachts sold in Florida, and advertises in Florida.

- 7 -

Case No. _____ -Civ-_____

29.     Defendant MarineMax, Inc. acquired Northrop & Johnson in 2020 and Fraser Yachts in 2019.  MarineMax, Inc.'s revenue for fiscal year ending September 30, 2023 was nearly $2.4 billion, with a net income of approximately $109.3 million. Approximately 70% of the company's revenue comes from new boat sales and approximately 5% comes from brokerage sales.

30.     Defendant MarineMax East, Inc. is a yacht brokerage incorporated in Florida, with a principal place of business in Clearwater, Florida.

31.     Defendant Sharon & Jack Malatich LLC, d/b/a S&J Yachts ("S&J Yachts") is a yacht brokerage.  S&J Yachts regularly sells yachts in Florida, has agents in Florida, collects substantial brokerage commissions from yachts sold in Florida, and advertises in Florida.  S&J Yachts is headquartered in Rock Hall, Maryland, and has offices in Palmetto, Naples, Stuart, and Fort Lauderdale, Florida.

32.     Defendant Northrop & Johnson Yachts-Ships, LLC ("Northrop & Johnson") is a yacht brokerage.  Northrup & Johnson regularly sells yachts in Florida, has agents in Florida, collects brokerage commissions from yachts sold in Florida, and advertises in Florida. Northrup & Johnson is headquartered in Fort Lauderdale, Florida.

33.     Defendant Rick Obey Yacht Sales LLC ("Rick Obey") is a yacht brokerage incorporated in Florida and based in Fort Lauderdale.  While the company's main office is located in Fort Lauderdale, Florida, it maintains satellite offices in Palm Beach Gardens, Florida and Huntington Beach, California. Rick Obey regularly sells yachts in Florida, has agents in Florida, collects brokerage commissions from yachts sold in Florida, and advertises in Florida.

- 8 -

Case No. _____ -Civ-_____

34.     Defendant Ocean Independence Yachts, LLC ("Ocean Independence") is a yacht brokerage incorporated in Florida and based in Fort Lauderdale with 14 officers around the world and over 400 yachts sold to date.  Ocean Independence regularly sells yachts in Florida, has agents in Florida, collects brokerage commissions from yachts sold in Florida, and advertises in Florida.

35.     Defendant OneWater Marine Inc. ("ONEW") is a publicly traded company and has 98 retail locations across the U.S.  It is incorporated in Delaware with a principal office in Georgia.  ONEW regularly sells yachts in Florida, has agents in Florida, collects brokerage commissions from yachts sold in Florida, and advertises in Florida.

36.     ONEW acquired Denison Yachting in 2022 and owns 30 other yacht/boat brokerages.  It reported in excess of $1.9 billion in revenue in fiscal year ending September 30, 2023.  Its adjusted EBITDA was $247 million in 2022 and $167 million in 2023.  Its currently reported market capitalization is $386 million and enterprise value is $1.48 billion.

37.     Defendant R.J.C. Yacht Sales, Inc. ("RJC Yacht") is a yacht brokerage.  RJC Yacht regularly sells yachts in Florida, has agents in Florida, collects brokerage commissions from yachts sold in Florida, and advertises in Florida.  RJC Yacht is headquartered in Fort Lauderdale, Florida.

38.     Defendant United Yacht Sales, LLC ("United Yacht Sales") is a yacht brokerage based in Stuart, Florida.  It regularly sells boats in Florida, has agents in Florida, collects substantial brokerage commissions from boats sold in Florida, and advertises in Florida.  United Yacht Sales touts itself as the world's largest yacht brokerage firm with 250 brokers in 104 locations.  It has sold over $1.75 billion in boats since opening its doors in 2002.

Case No. _____ -Civ-_____

39.     United Yacht Sales' estimated annual revenue is currently $56.3 million per year.[2] United Yacht Sales is the world's largest yacht brokerage firm with over 150 brokers worldwide and more than 25 offices that create the biggest network of boat buyers and sellers in the industry.[3]

40.     Defendant Worth Avenue Yachts, LLC ("Worth Avenue") is a yacht brokerage incorporated in Florida and headquartered in Palm Beach Florida.  Worth Avenue regularly sells yachts in Florida, has agents in Florida, collects substantial brokerage commissions from yachts sold in Florida, and advertises in Florida.

41.     Allied Marine, Denison Yachting, Galati, HMY, IYC, MarineMax, Inc., MarineMax East, Inc., S&J Yachts, Northrup & Johnson, Rick Obey, Ocean Independence, ONEW, RJC Yachts, United Yacht Sales, and Worth Avenue are collectively referred to as the "Broker Defendants."

**Other Defendants**

42.     Defendant Boats Group, LLC ("Boats Group") owns and operates several large yachting MLSs, including Boat Trader, YachtWorld, and Boats.com.  Boats Group owns BoatWizard, access to which is limited to brokers and dealers and allows them to make and print custom presentations of boats listed on the MLS that Boats Group owns and operates.  Boats Group owns and operates YachtCloser.com, which provides yacht brokers with draft brokerage contracts.

---

2   *United Yacht Sales Revenue and Competitors*, Growjo (last visited Mar. 20, 2024), https://growjo.com/company/United_Yacht_Sales.

3   *About United Yacht Sales*, Superyacht Times (last visited Mar. 20, 2024), https://www.superyachttimes.com/companies/united-yacht-sales.

Case No. _____ -Civ-_____

Boats Group is headquartered in Miami, Florida. Boats Group does substantial business in Florida, including collections of listing fees from Florida yacht brokerages.

43.     Defendants Permira Advisers Limited and Permira Advisers LLC (collectively, "Permira") owns and operates Boats Group. Through Boats Group, and other ventures, Permira regularly does business in Florida.  Permira is a British company, with an office in London. Permira Advisers LLC is headquartered in New York, New York.

**Defendant Yacht Broker Associations**

44.     Defendant International Yacht Brokers Association, Inc. ("IYBA"), f/k/a the Florida Yacht Brokers Association, touts that it has "more than 1900+ members and growing" and is "the world's largest and most influential association for the yacht brokerage & charter industry." IYBA has a legislative affairs program that advocates for the interests of yacht brokers.  In 1987, the IYBA was "founded by a coalition of yacht brokerage business owners in South Florida."  In 2013, the IYBA introduced standardized contracts for the transaction of yacht sales.  In 2019, the IYBA, in conjunction with other yacht broker associations, including the Yacht Brokers Association of America, Inc., founded yachtbroker.org, as an association-owned MLS platform to serve the yacht brokerage community.  The IYBA is based in Miami, with numerous members as well as some officers and directors based in Florida. It has collected substantial dues and membership fees from yacht brokers in Miami, including in the last four years.

45.     Defendant Yacht Brokers Association of America, Inc.'s ("YBAA") mission is "to unite Yacht Sales Professionals throughout North America to establish, promote and enforce high standards of professional competence, character, and ethical conduct."  Its principal place of business is in Washington, DC and it lobbies on behalf of yacht brokers, including in Florida.  The

Case No. _____ -Civ-_____

YBAA is a professional trade association comprised of over 250 corporate firms representing over 1,000 individual yacht sales professionals. The YBAA has collected substantial dues and membership fees from yacht brokers in Miami, including in the last four years. YBAA, along with other yacht broker associations, founded yachtbroker.org as an industry-owned MLS.

46.     In order to create uniformity in pre-owned yacht brokerage industry sales practices, YBAA, in partnership with IYBA and additional yacht broker associations, established the Certified Professional Yacht Broker certification program, which is used throughout the United States. Uniform CPYB standards, including the seller pays buyer's broker requirement, along with standardized forms, are contained in program materials entitled The Guide For the Professional Practice of Yacht Brokerage & Sales (YBAA 2020 ed.).

**Multiple Listing Services Defendant**

47.     Defendant YATCO, LLC was founded in 2000 by seven professional yacht broker associations. A boating MLS, YATCO is headquartered in Deerfield Beach, Florida and lists about 7,709 yachts on its website. YATCO states that it has 3,000 members, and that it "works with over 2,000 professional yacht brokers" and has the largest and most reliable inventory of new and used yachts for sale. YATCO collects substantial fees from brokerages in Florida and elsewhere for listing their yachts on YATCO.

48.     YATCO, Yachtbroker.org, and YachtWorld are collectively referred to as MLSs.

49.     The Broker Defendants, Boats Group, Permira, IYBA, YBAA and YATCO are collectively referred to as "Defendants."

Case No. _____ -Civ-_____

## UNNAMED CO-CONSPIRATORS

50.    Other unnamed co-conspirators include other yacht brokers, other yacht broker associations, and other yachting MLSs, who acted in concert with Defendants to boost yachting commission rates to a supracompetitive level and to maintain them at that inflated level.

## FACTUAL ALLEGATIONS

**Boating Industry Background**

51.    In Florida, only licensed brokers may represent sellers or buyers in the pre-owned yacht market.  *See* Fla. Stat. §326.004.

52.    Under Florida law, only licensed brokers may be paid a commission to represent buyers or sellers in a yacht transaction.  Accordingly, all yacht brokerage contracts between sellers and buyers require participation of licensed brokers.

53.    A typical Central Listing Agreement provides for a pre-owned boat or yacht commission equal to 10% of the purchase price of the yacht, with the commission paid at the time of the sale.  The commission is shared between the Listing Broker (*i.e.*, the seller's broker) and the Selling Broker or cooperating broker (*i.e.*, the buyer's broker), often on a 50/50 or 60/40 basis.

54.    The total commission is paid by the seller to the seller's broker, also known as Listing Broker.  The Listing Broker in turn pays a substantial part of the commission to the buyer's broker, with the specific commission split requirement being imposed on sellers.

55.    Most brokers represent yacht sellers in some transactions and yacht buyers in other transactions.  Thus, most brokers share in the high commission rates paid to buyer's brokers.

56.    By way of illustration, if a pre-owned yacht is sold for $600,000 with the seller paying a 10% commission rate and the Listing Broker offering 50% of that commission to the

Case No. _____ -Civ-_____

buyer's broker, then the seller will pay a commission of $60,000 and their broker will pay half of that commission (*i.e.*, $30,000) to the buyer's broker.  It is completely opaque to the seller.

57.     An MLS is a database of pre-owned boats and yachts available for sale, just like MLSs in the residential real estate market lists homes available for sale.  The boats and yachts listed on an MLS are accessible to brokers who belong to and comply with the rules of the MLS. The commission split on a given boat, that is the rate being offered to the buyer's broker, is accessible on the MLS only to brokers.

58.     Most boats and yachts listed on the MLSs are listed with a Central Listing Agreement that specifies that the Listing Broker will pay a mandatory commission to a broker who brings a buyer to the transaction, and specifying the percentage commission to be paid to the buyer's broker.

59.     This system, which has been in place continuously since at least January of 2000, causes sellers to pay commissions to buyer's brokers that they would not otherwise pay in a competitive market and also to pay inflated aggregate commission rates.

60.     The Boats Group owns YachtWorld, a Miami-based MLS organization that was established in 1995.  It claims to be "the largest database of brokerage boats for sale offered by more than 2,900 yacht brokers and 70 manufacturers worldwide."

61.     YachtWorld, one of the largest yachting MLS states:

Yacht brokers charge a commission when a vessel is sold, and the commission amount will be specified in writing when the boat owner signs a listing agreement with the seller's broker.  If another broker brings a buyer to the table on a co-brokerage arrangement, the total commission will be shared between the two brokers. A commission on a yacht is typically not more than 10 percent.  Often

Case No. _____ -Civ-_____

that's split 50/50, or sometimes it's 60/40.  The boat owner/seller always pays the brokerage commission.[4]

62.     YachtWorld will only accept listings from a licensed broker.  YachtWorld has nearly 3,000 international brokerages listed and currently has more than 100,000 yachts for sale.

63.     Similarly, MarineMax, Inc. one of the larger boat brokerages and dealers, states: "By listing on YachtWorld, your broker has agreed to sell it through a co-brokerage agreement that requires your broker to split the typically 10% commission with the buyer's broker. About 70-percent of all brokerage sales are co-brokered."[5]

64.     A form contract from the YBAA, a "VESSEL BROKERAGE CENTRAL LISTING AGREEMENT," illustrates the standard form used by the YBAA.  It provides the boat owner will pay a commission set as a percentage of the selling price.  This standard form agreement further specifies that the broker, in turn, agrees to distribute information about the boat for sale to "Corresponding Brokers," *i.e.*, brokers representing potential buyers, and "[t]o pay any Corresponding Broker who sells the VESSEL a percentage of the commission."[6]

65.     Importantly, the Vessel Brokerage Central Listing Agreement requires the Selling Broker to agree:  "To pay any Corresponding Broker who sells the VESSEL, a percentage of the commission."

---

[4]     Jeanne Craig, *Co-Brokerage: What the Yacht Buyer Needs to Know*, YachtWorld (Oct. 20, 2013),       https://www.yachtworld.com/research/co-brokerage-what-the-yacht-buyer-needs-to-know/.

[5]     *A Yacht Broker to Navigate You Through the Process*, MarineMax (last visited Mar. 20, 2024), https://www.marinemax.com/boats-and-yachts/brokerage/brokerage-process#:~:text=By% 20listing%20on%20YachtWorld%2C%20your,brokerage%20sales%20are%20co%2Dbrokered.

[6]     *The Guide For the Professional Practice of Yacht Brokerage & Sales* (YBAA 2020 ed.).

Case No. _____ -Civ-_____

66.     Yachtbroker.org is also an important pre-owned boat and yacht MLS.  The company is headquartered in Fort Lauderdale, Florida.  In 2019, the IYBA and YBAA introduced yachtbroker.org as the only association-owned MLS platform to the yacht broker community.  This service allows members to control and exchange purchases and sales data and promote their products in ways never before achievable through private enterprise.

67.     According to the IYBA, "[t]he IYBA MLS unites our members for the benefit of our members."  The IYBA describes its MLS this way:

> The member listing service (MLS) is a database established by our industry's leading professional yacht broker associations to collect, control & provide data about vessels for sale and is exclusively for yacht sales professional use.  The MLS allows yacht brokers to see one another's listings with the goal of connecting buyers to sellers through a yacht sales professional (YSP).

68.     Almost all large boats and yachts are advertised for sale on the MLSs. Most brokerage firms require their brokers to list boats and yachts for sale on those MLSs.  Large boats and yachts not listed on those MLSs are much less visible and severely disadvantaged in sales, if they sell at all.

**Anticompetitive Rules**

69.      Defendants have conspired to boost buyers' brokers' commission rates and total commission rates above a competitive level and to maintain those inflated rates through numerous actions.  Among other things they have enacted anticompetitive rules through influential trade associations composed of yacht brokers who should be competing with one another but, instead, cooperate with each other to the detriment of pre-owned boat sellers.

70.     For example, the YBAA rules, enshrined in its Code of Ethics – like other association rules – prohibit brokers from competing with one another in certain ways, direct

Case No. _____ -Civ-_____

members to cooperate even when they are representing clients with competing interests, and direct

members to use standardized form contracts that purport to embody these principles.  The preface

to the Code of Ethics states:

> YBAA strongly recommends that all members utilize YBAA's copyrighted,
> standardized contractual Forms, which are provided as a free member benefit,
> designed to simplify the transaction process and to enhance customer satisfaction.
> Forms include: Central Listing Agreement; Open Listing Agreement; Purchase &
> Sale Agreement; and Acceptance of Vessel; and Amendment to the Purchase &
> Sales Agreement and are available in U.S. and Canadian versions.  Use of the forms
> is strictly limited to current members, without alteration or edits. Members will use
> the current dated version of each Form.  Forms are updated annually.[7]

The Code of Ethics rules prohibit certain forms of competition, stating:

> 3.2 The Broker and/or Brokerage firm who holds a Central Listing will be
> respected. A Brokerage firm will not solicit a Central Listing from a Seller while
> that Seller has a Central Listing agreement with another Broker.  A Broker
> cooperating with a listing Broker will not invite the cooperation of a third Broker
> without the consent of the listing Broker.[8]

71.     The Code also requires seller and buyer brokers to cooperate with one another,

sharing commissions, stating:

> 3.3 *The Broker will cooperate with other Brokers on vessels listed by*
> *him/her on a Central Listing basis whenever it is in the interest of the Seller,*
> *sharing commissions on a previously agreed basis*.  Negotiations concerning
> vessels listed on a Central Listing basis will be carried on with the listing Broker,
> not with the Seller, except with the consent of the listing Broker.
>
> 3.4   When a Broker obtains a Central Listing, he/she will endeavor to
> distribute the listing to corresponding Brokers as quickly as possible.  *Central*
> *Listings and shared Open Listings are generally shared on a commission basis,*
> *agreed to beforehand as a matter of policy, or agreed upon by the cooperating*
> *parties negotiated on a particular sale*.  Should the central or loaning Broker show
> the boat or perform work above and beyond the customary effort of providing the

---

7    *Code of Ethics & Business Practice*, YBAA (approved Aug. 17, 2007, reviewed July 12,
2021), https://www.ybaa.org/aws/YBAA/asset_manager/get_file/50088?ver=9194.

8    *Id.*

Case No. _____ -Civ-_____

listing and negotiating with the Seller, the commission arrangements should be reconsidered by the parties involved.[9]

72.    The IYBA rules also direct brokers to cooperate with one another, even though their clients obviously have competing interests.  The bylaws state that the purpose of the IYBA is "[t]o unite those engaged in the yacht brokerage business for the purpose of promoting cooperation and professionalism among its members."[10]  Similarly, the Code of Ethics, which are part of the IYBA bylaws, state:

> Section 17.   Members should cooperate with other members on vessels listed with him whenever it is in the interest of the client.  Negotiations concerning a vessel listed exclusively with one member should be carried on with the listing broker, not the owner, except with the express consent of the listing member.  ***All shared commission agreements should be negotiated prior to the submission of any Offer to Purchase***.[11]

73.    The ethical rules also prohibit brokers from competing with one another in certain ways, stating:

> Section 15.  Members should not advertise other members' listings without their permission. Prices advertised on other members' listings should not be other than the listed offering price.

> Section 18.   The agency of a member who holds an exclusive or central listing should be respected.  A member cooperating with the listing member should not invite the participation of a third party without the express consent of the listing Broker.[12]

---

[9]    *Id.*

[10]    *Bylaws of the Florida Yacht Brokers Association*, IYBA (last visited Mar. 20, 2024), https://iyba.org/bylaws.

[11]    *Id.*

[12]    *Id.*

Case No. _____ -Civ-_____

74.     The IYBA provides a model Central Listing Agreement which specifies that the seller is solely responsible for the broker's commission.  The IYBA added that provision to the Purchase Sales Agreement ("PSA") so that a broker can point to paragraph 5 of the PSA and reassure the buyer, since buyers are not parties to and do not see the Central Listing Agreement, that the buyer will not be liable for the commission.[13]

75.     Significantly, the IYBA rules specify that the commission split should be "negotiated [between the brokers] prior to the submission of any Offer to Purchase" thereby precluding buyers from making an offer to purchase a yacht for a reduced price by reducing the commission paid to the buyer's broker.  The YBAA rules also specify that the commissions splits should be "agreed to [by the brokers] beforehand as a matter of policy."

76.     As demonstrated below, members of the YBAA and IYBA, as well as other yacht broker associations, that do not comply with these anticompetitive rules set forth in the respective organizations Code of Ethics face disciplinary action, including potential expulsion.

77.     The YBAA application for corporate membership specifies the requirements for membership, stating, *inter alia*:  "Any sole proprietorship, partnership or corporation legitimately established and engaged in the full time ***practice of selling yachts on a co-brokerage basis*** who meets, or agrees to comply with the following."[14]  One of the specified conditions is to: "[e]nsure

---

[13]   *FYBA Brokerage Forms Update* (July 30, 2014), https://iyba.org/news-detail/fyba-brokerage-forms-update.

[14]   *YBAA Corporate Membership Application*, YBAA (last visited Mar. 20, 2024), https://associationdatabase.com/aws/YBAA/input_form/display_form_01_show?contact_id=$$Contact%20ID$$&form_no=167&host=retain&contact_id=$$Contact%20ID$$&_gl=1*117djyb*_ga*MjExMzI5ODgzNy4xNzEwOTQ2OTk0O*_ga_9XKP0NS5LB*MTcxMDk0Njk5NC4xLjAuMTcxMDk0Njk5NC42MC4wLjA.

Case No. _____ -Civ-_____

that all business conducted by the company and its brokers (including employees, independent contractors, etc.) complies in full with the Association's Code of Ethics."[15]

78.     In a 2022 article, the executive director of the YBAA advised brokers that if they do not list their yachts for sale under a co-brokerage agreement they might be in violation of the YBAA Code of Ethics and also of the YBAA's Central Listing Agreement and are potentially exposing themselves to ethical and legal action.[16]

79.     Defendants have also conspired to create, impose, and maintain inflated commission rates through the MLSs, which they control directly or indirectly.

80.     For instance, YATCO, one of the largest and most important yachting MLSs, only accepts centralized listings by professional brokers and those listings must make an offer of compensation to the buyer's broker.[17]   The YATCO Rules & Regulations website states: "For YATCO Professional Members to list their yacht listings on YATCO.com, they ***must*** show proof of a current Central Listing Agreement.  A Central Listing Agreement is entered into with just one brokerage firm, thus guaranteeing the listing agent and listing yacht broker a portion of the selling commission."  The agreement requires an owner to agree upfront to a commission split and that the broker must similarly agree "[t]o pay any corresponding broker who sells the YACHT, a percentage of the commission received from the OWNER."

---

[15]   *Id.*

[16]   JP Skov, *Not Available for Co-Brokerage* (Feb. 15, 2022), https://ybaa.yachts/aws/YBAA/ page_template/show_detail/422324?model_name=news_article.

[17]   Unlike the major MLSs, Boat Trader and Boat.com deal primarily with smaller boats and accept FSBO listings.

Case No. _____ -Civ-_____

81.     YATCO touts its similarity to the regional MLSs that dominate the market for residential real estate, stating: "Similar to realtors using a real estate MLS system, YATCO Members adhere to a strict code of rules and ethics."  Those rules include the rules of the IYBA and the YBAA, and other yacht broker associations, which mandate brokers to share the commission paid by the seller.

82.     The information on commissions offered to buyer brokers is available only to brokers and dealers. Similarly, information on prices at which yachts have previously sold are not generally available to the public on the MLSs.

83.     Because of its popularity, YATCO has had an enormous influence on the sale of yachts in its coverage area. YATCO has reported more than 150,000 registered customers and over 2,000 professionals using its products. The company also recently reported over $5 billion in annual transactions worldwide.

84.     YachtWorld also limits listing to professional agents.  "Only brokers can list boats on the site, which functions much like the Multiple Listing Service for real estate agents."[18] YachtWorld does not accept FSBO listings, that is, listing from boat owners who want to sell their boats themselves without the use of a broker. Rather, the MLS states:

> To have your boat presented on the YachtWorld.com site, we require that you use the services of a professional yacht broker.  YachtWorld advertising services are only available to yacht brokerage firms and dealerships representing multiple boats for sale on behalf of an owner/seller such as yourself.  We do not offer services directly to the individual owner/seller.

---

[18]  *Especially when buying or selling a large boat, the right broker can reduce stress and make the transaction go smoothly and painlessly*, BoatU.S. (last visited Mar. 21, 2024) ("*Especially when buying*"), https://www.boatus.com/expert-advice/expert-advice-archive/2013/october/what-a-yacht-broker-can-do-for-you.

Case No. _____ -Civ-_____

85.    In 2009, YachtWorld and the YBAA entered into a collaboration agreement.  In announcing the agreement, YBAA's then president, David Pugsley, emphasized the role and success of YachtWorld in ensuring selling brokers share their commissions with buyer brokers: "'YBAA has teamed up with YachtWorld because of their extraordinary track record and ability to help yacht brokers promote and ***co-broker their listings to buyers around the world***.'"[19] YachtWorld in turn promised, according to the press release, to use its influence to promote the YBAA's standards, which include a general directive on sharing commissions, stating: "YachtWorld will use its broker communication network to educate its members with professional standards developed by YBAA and YachtWorld."

86.    YachtWorld will accept only the following categories of listing contracts:

"[C]entral/exclusive listing" shall refer to a written listing agreement signed by the owner of the vessel authorizing only one brokerage to offer a boat for sale whereby such owner relinquishes the right to sell the boat himself or herself and agrees to pay the listing brokerage a specified commission if any sale is entered into during the term of the listing agreement. Proper broker-to-broker ethics do not allow any contact with the owner without the listing broker's authorization;

"open/non-exclusive listing" shall refer to a written listing agreement signed by the owner of the vessel given to one or more brokerages whereby the broker that produces a buyer is paid a commission and the owner remains free to sell the boat to his or her own prospects without paying a commission;

"trade-in" shall refer to a boat owned by a dealer or brokerage being offered for sale; [and]

"available for co-brokerage" shall refer to a mutual agreement to split the commission between two brokerage firms for a sale completed by two firms. Traditionally the Listing Agent (firm with the signed agreement with seller to offer boat) and the Selling Agent (firm representing buyer with a signed Purchase &

---

[19]  *YachtWorld.com and YBAA Sign Collaboration Agreement*, YachtWorld (June 8, 2009), https://www.yachtworld.com/research/yachtworldcom-and-ybaa-sign-collaboration-agreement/.

Case No. _____ -Civ-_____

Sales Agreement) cooperate to sell either a Central/Exclusive or an Open/Non-Exclusive listing.[20]

87.     The vast majority of yachts sold through YachtWorld are sold through a co-brokerage agreement with the selling and buying broker sharing in the brokerage commission.

> A central agency agreement (sometimes called an exclusive listing) means you've hired a specific broker to sell your boat.  With this type of agreement, the broker typically lists your boat on YachtWorld and – this is important – is obligated to sell it through a co-brokerage arrangement. Co-brokerage means that if another broker finds a buyer for your boat, your broker agrees to split the commission with him.  This incentive to help each other is why about 70 percent of all brokerage sales are co-brokered. Keep in mind, though, with this type of agreement, even if you bring in the seller or end up donating your boat, you'll still be liable for the broker's commission.  The majority of brokerage sales are central agency agreements.[21]

88.     YachtWorld advises boat owners against listing their boat with anything other than a co-brokerage agreement.

> An open listing agreement means you've given more than one broker the right to sell your boat and you also retain the right to sell it on your own.  The disadvantage is that because no broker is guaranteed at least a part of the commission, it's not very likely any of them will spend the money to list your boat on YachtWorld or pay for other advertising.  There can also be confused communications between multiple brokers and potential buyers.  On the other hand, a hungry broker may be more motivated to bring you a buyer because he would get the entire commission.  With this type of agreement, if you find your own buyer, you don't owe anyone a commission.[22]

---

[20]   *Service Agreement and Policies*, Boats Group (last visited Mar. 21, 2024), https://www.boatsgroup.com/service-agreement-and-policies/.

[21]   *Especially when buying*, *supra* n.18.

[22]   *Id.*

Case No. _____ -Civ-_____

89.     On YachtWorld, brokers can search listings by co-brokerage status to make sure the listing offers a mandatory commission to the buyer broker.[23]

**Oversight of and Enforcement of Rules**

90.     YATCO has published its Listing Rules & Regulations over the years on its website.  The rules state: "All YATCO Professional Members must adhere to a strict code of ethics, rules, and regulations to continue to be a YATCO Professional Member and maintain their membership to . . . one or more   [specified] associations [including YBAA]."   Currently, YATCO's website indicates that: "All YATCO Members must adhere to a strict code of ethics, rules, and regulations to list their yachts for sale and charter on the YATCO MLS and to continue to be a YATCO Professional Member."  In that regard, YATCO requires: "To be a member of YATCO, a company must be an active member of a professional association or must have a referral from two existing YATCO members."

91.     YATCO accepts "only central yacht and boat MLS listings. We are concerned about the negative impact of open listings on our industry."

92.     The yacht broker associations, IYBA and YBAA, can impose significant penalties on members who do not comply with their rules, including rules about cooperating with competing brokers.

    Article V:

        Section 3. Suspension or Expulsion.  For failure to abide by the Bylaws of
    the Association, or if it appears from a written communication from any member
    or other person or persons that the conduct of a member has been prejudicial to the
    Association or yacht brokerage profession, the Board of Directors, after citing said

---

[23]  *YachtWorld Broker Appreciation Days*, YachtWorld (Feb. 14, 2012), https://www.yachtworld.com/research/yachtworld-broker-appreciation-days/.

Case No. _____ -Civ-_____

member, with seven days notice of hearing, shall have full power to suspend for a period of not more than one year, or expel said member, and he shall be and is expelled after being so declared.  Any member suspended or expelled shall have the right, after six months from the date of suspension or expulsion, to apply for reinstatement.  It shall be the duty of the Secretary to notify in writing each Active Member of the Association in case of such suspension or expulsion.[24]

YBAA Code of Ethics:

    1.8.d.  If the Broker is found to have been in violation of the YBAA Code of Ethics, the decision will be forwarded to the member brokerage firm principal with whom the broker is employed or contracted.  The principal will be asked to respond to the YBAA Professional Standards & Ethics Committee, acknowledging the problem and defining the actions they will take to ensure that no further such violation occurs.  The decision will be kept on file in the YBAA office and, if the broker is CPYB certified, forwarded to the CPYB Certification Advisory Council.

    1.8.e.  If the same Broker is found guilty of a second violation of the Code of Ethics, the Broker, and their employing brokerage will be suspended from YBAA membership for one year, after which membership reinstatement will be considered upon request of the brokerage.  The Professional Standards & Ethics Committee decision regarding the suspension may be published in YBAA's *Yacht Broker News* newsletter and/or referred to the CPYB Certification Advisory Council.  A record of all such actions will be maintained by the YBAA office.

    1.8.f.  If the same Broker is found guilty of any third violation of the Code of Ethics, the Broker will be permanently terminated from membership in YBAA.  The broker's employing member firm will also be reviewed by the Professional Standards & Ethics Committee for possible suspension or termination.  The loss of such memberships may be reported in the *Yacht Broker News*.

**Defendants Designed, Joined, and Participated in the Conspiracy**

    93.    Broker Defendants joined, furthered, and maintained the conspiracy alleged here in multiple ways, including at least: (a) having their executives participate in the IYBA and YBAA, including those associations adoption, maintenance, and enforcement of the rule that sellers pay both their and buyers' commissions; (b) requiring their broker employees to comply with the

---

[24]  *Bylaws of the Florida Yacht Brokers Association, Inc.*, IYBA (last visited Mar. 21, 2024), https://iyba.org/bylaws.

Case No. _____ -Civ-_____

anticompetitive IYBA and YBAA rules, including the rule that sellers pay both their and buyers'
commissions; and (c) having their executives promulgate and/or enforce the anticompetitive rules
adopted by the MLSs.

94.     Jonathan Chapman, formerly with Northrop & Johnson at its Newport, Rhode
Island location, and now with Worth Avenue, was the YBAA President from 2020 to 2022.  He is
currently the 2024 YBAA Treasurer.  William Bolin, of Defendant S&J Yachts, is also on the
YBAA board of directors, serving as Vice President.

95.     Current members of the IYBA board of directors include: Charles A. Cashman of
MarineMax, Inc., Trevor Carroll of Fraser Yachts, James Corts of MarineMax, Inc., Michael L.
Scalisi of HMY, Carmine Galati Jr. of Galati, and Cole Watkins of Allied Marine/Ferretti Group.
Trevor Carroll is the current IYBA Vice President.

96.     Executives with the Broker Defendants and the yacht broker co-conspirators hold
key positions with the yacht broker associations, and have furthered the conspiracy by helping the
IYBA and the YBAA to promulgate and/or enforce anticompetitive rules including that sellers pay
both their and buyers' commissions, including by requiring their members to comply with such
rules.

97.     For instance, Galati brokers "all are certified professional yacht brokers earning
their designation from either the Certified Professional Yacht Broker or the International Yacht
Brokers Association."[25]

---

[25]   *Working with a Yacht Broker*, Galati Yacht Sales (last visited Mar. 21, 2024), https://www
.galatiyachts.com/working-with-a-yacht-broker/.

Case No. _____ -Civ-_____

98.     Allied Marine touts of its brokers:"All of whom adhere to the International Yacht Brokers Association (IYBA) professional code of ethics."[26]

99.     Denison Yachting says its brokers are all members of major associations, including IYBA and the YBAA.[27]

100.    S&J Yachts touts: "We are a member of the Yacht Brokers Association of America (YBAA) and adhere to a strict code of ethics."[28]

101.    Broker Defendants also help maintain the rule that sellers pay both their and buyers' commissions by promoting the claim that brokerage services are free to buyers, thereby undercutting any movement to have buyers negotiate fees with their brokers.  For instance,  United Yacht Sales, admits: "Boat buyers often forget that it costs nothing to hire a yacht broker to help you find the right vessel."[29]  Other Defendants make the same or similar representations.  For instance, YachtWorld states: "Traditionally, the seller pays the commissions that a yacht broker earns – not the buyer . . . ."

---

[26]  *Our Philosophy*, Allied Marine (last visited Mar. 21, 2024), https://www.alliedmarine.com/sell-your-yacht/yacht-sales-philosophy.

[27]  *10 Ways Denison Can You're your Boat Faster*, Denison Yachting (last visited Mar. 21, 2024), https://www.denisonyachtsales.com/list-your-boat-with-denison/.

[28]  *Sell Your Boat Quickly & For Top Value*, S&J Yachts (last visited Mar. 21, 2024), https://sjyachts.com/services/sell-your-boat/.

[29]  Rob Bowman, *Why You Need to Hire A Yacht Broker When Buying a Yacht*, United Yacht (posted May 10, 2017, updated June 3, 2020), https://www.unitedyacht.com/Yacht-News/why-you-need-to-hire-a-yacht-broker-when-buying-a-yacht#:~:text=A%20yacht%20broker%20can%20really%20help%20you%20focus,making%20sure%20that%20you%20make%20the%20right%20decision   [https://web.archive.org/web/20231001011015/https://www.unitedyacht.com/Yacht-News/why-you-need-to-hire-a-yacht-broker-when-buying-a-yacht].

Case No. _____ -Civ-_____

**Effects of the Conspiracy**

102.    Defendants' actions have caused yacht sellers to pay brokerage fees elevated above commission rates that would prevail in a competitive market.  Defendants' actions have caused at least the following anticompetitive results:

- Yacht sellers have been forced to pay commissions for brokers who represent buyers even though the buyers' interest is opposed to the sellers' interest, thereby substantially inflating the costs of selling their yachts;

- Yacht sellers have been compelled to set a high buyer broker commission to induce buyer brokers to show their yachts to the buyer brokers' client;

- Yacht sellers who do not offer a sufficiently high commission to buyer's brokers risk having buyer brokers direct or steer their clients to sellers who offer a higher buyer broker commission;

- Sellers who refuse to offer a buyer broker's commission are prohibited from having their yachts listed on key MLSs and their yachts receive much less exposure than yachts sold by boat owners who comply with the standard fee sharing agreements;

- Brokers cooperate with one another to their mutual benefit and the detriment of the boat seller even though the respective clients have competing interests;

- Boat purchasers do not negotiate with brokers representing them to determine the level of services they want and the commission rate they are willing to pay;

- Boat purchasers erroneously believe they receive brokerage services without anyone paying for those services;

- Price competition among brokers to be retained by yacht buyers has been restrained, as has price competition among brokers seeking to be retained to sell yachts;

- Competition among yacht buyers has been restrained by their inability to compete for the purchase of a yacht by lowering the buyer broker commission; and

- The Broker Defendants have increased their profits substantially by receiving inflated buyer broker commission and inflated total commissions.

103.    There is no pro-competitive benefit to Defendants' conspiracy.  But for the conspiracy, buyer-agents would negotiate directly with yacht buyers in a more competitive market

Case No. _____ -Civ-_____

without the problems that arise from having the buyer's commissions determined by the seller's broker and seller. The buyer-agents would have to compete more vigorously on price and service, leading to a decrease in commission rates paid to buyer-brokers as well as a decrease in the overall commission rates.[30]

104.    Defendants' success in maintaining high commission rates for buyer brokers (and, substantially increasing those commission rates, in inflation adjusted terms) despite the advent of new technologies, including the increased reliance on the internet and yachting MLSs, presents a stark contrast to the experience of other industries. Defendants' success in maintaining inflated commission rates is similar to the success of real estate companies and agents, until recently, in maintaining elevated residential commission rates for selling homes. What was said about the residential real estate industry is equally true of the yachting industry. "[I]n almost every other consumer industry – booksellers, retailers, home appliances, insurance, banking, stock brokers – the introduction of Internet and discount sellers has been a phenomenal financial benefit to

---

[30]    Significantly, in one of the pending class actions challenging commission practices in the real estate marker (*Nosalek v. MLS Prop. Info. Network*, No. 1:20-cv-12244-PBS (D. Mass. Feb. 15, 2024), the U.S. Department of Justice entered an appearance and rightly asserted that "[a]s long as sellers can make buyer-broker commission offers, they will continue to offer 'customary' commissions out of fear that buyer brokers will direct buyers away from listings with lower commissions – a well-documented phenomenon known as steering." ECF 290 at 2. Such a rule's anticompetitive effect, in part, encompasses the ability of sellers to set compensation for the buyer's broker, instead of promoting competition by permitting buyers to negotiate directly with their own brokers. The core anticompetitive nature of the required practice that sellers' pay buyers' brokers' commissions is the same in both real estate and pre-owned yacht sales.

Case No. _____ -Civ-_____

customers. . . . Economists call this process of squeezing out transaction costs 'disintermediation.' If any industry is ripe for this, it is the $70 billion-a-year real estate brokerage market."[31]

105.    There is also a sharp disconnect between buyer-agent costs and buyer-agent commissions.  Normally competition pushes firms to adopt fee structures that approximate their costs, but this is not the case for yachting brokerage fees.  For example, buyer-agent costs are similar regardless of the price of the yacht.  As *The Wall Street Journal* has explained about the real estate industry, plagued by anticompetitive conduct similar to that which plagues the yachting industry, "[m]any, if not most, of the services that Realtors provide don't vary with the sales price, so the percentage fee should fall as home price rises."  Instead, broker commissions remain divorced from the quantity, quality, and value of the services.

106.    Even if there were any plausible pro-competitive effects, they would be substantially outweighed by the conspiracy's anticompetitive effects.  There is substantial economic evidence that Defendants' conspiracy has resulted in buyer-agent commissions and total commissions that are inflated well above a competitive level nationwide.[32]

---

[31]   Opinion, *The Realtor Racket*, The Wall Street Journal (Aug. 12, 2005), https://www.wsj.com/articles/SB112381069428011613.

[32]   On March 15, 2024, the National Association of Realtors ("NAR") agreed to pay $418 million in damages to settle real estate commission lawsuits which, just like the boating commission terms, had a provision requiring sell-side agents to make an offer of compensation to buyer brokers.  The settlement entered by the NAR would ban any rules that would allow a seller's agent to set compensation for a buyer's agent.  This comes after a jury verdict in a trial in Missouri brought by home sellers against the NAR and certain real estate brokerage firms found those entities liable for the same conduct for $1.8 billion.  Debra Kamin, *Powerful Realtor Group Agrees to Slash Commissions to Settle Lawsuits*, The New York Times (Mar. 15, 2024), https://www.nytimes.com/2024/03/15/realestate/national-association-realtors-commission-settlement.html.

Case No. _____ -Civ-_____

**Relevant Markets and Defendants' Market Power**

107.    The relevant service market for the claims asserted herein is yacht services provided to yacht sellers and buyers by yacht brokers with access to the MLSs.

108.    Defendants control of the MLSs and of the IYBA and YBAA gives them the ability to impose anticompetitive rules, including the rule that sellers pay both their and buyers' commissions, and other anticompetitive IBAA and IYBA rules, on class members and other market participants.

109.    The relevant geographic market for the claims asserted herein is the geographic area in which the MLSs operate.

110.    Defendant brokers and other conspiring brokers collectively provide the vast majority, if not the entirety, of yacht broker services in these areas.

111.    The overwhelming majority of larger boats yachts sold in these geographic areas were listed on one of more of the MLSs by brokers that are subject to and comply with the MLSs rules and standards as well as the rules and standards of the YBAA and the IYBA.

112.    Defendants and their co-conspirators collectively have market power through their control of the MLSs, the IBAA, the IYBA, and their dominant share of the market.

113.    Access to the MLSs is critical for brokers and agents to assist sellers and buyers.

114.    Any broker who wished to compete outside of Defendants' unlawful agreement in the areas where the MLSs operate would face insurmountable barriers.

115.    A broker who represented a Seller without using MLSs would lose access to the large majority of potential Buyers, and a broker who represented a Buyer without using same

Case No. _____ -Civ-_____

would lose access to the large majority of Sellers.  Brokers cannot conduct business effectively without access to the MLSs.

116.    An alternative MLS or listing service attempting to compete effectively with a Defendant MLS, without including Defendant MLS listings, would not have listings as comprehensive as the listings on the MLSs.

117.    Brokers and their individual agents who currently profit from inflated commissions and total commissions have minimal incentive to participate in an alternative MLS service that would generate lower commissions and lower total commissions. Further, many Buyers would be reluctant to retain a broker operating on an alternative MLS that required them to pay the broker's commission, when other brokers operating on MLSs are entirely compensated by Sellers. Accordingly, Seller's brokers on an alternative MLS would struggle to attract Buyers' brokers and their Buyer clients.

118.    Moreover, many yacht Sellers would not retain brokers using a new, unfamiliar MLS that had no track record of success and had failed to attract sufficient buyer and sellers brokers.  Accordingly, a listing service attempting to compete with the MLSs, without relisting their listed properties, would likely fail to attract enough property listings to operate profitably and be a competitive constraint on the MLSs.

119.    The fact that there is not a listing service that competes with the MLSs is indicative of the substantial barriers to entry.

**Allegations Regarding the Named Plaintiff**

120.    On July 2, 2020, Plaintiff Kip Lamar Snell entered into an IYBA form Central Listing Agreement with Galati to sell a 41-foot 2003 Express Cruiser Sea Ray.  The specific Galati

- 32 -

Case No. _____ -Civ-_____

broker signing the agreement is named Roger Barnhart, who is a Certified Professional Yacht Broker ("CPYB") under the CPYB standards.  Consistent with "the norm" offered by Listing Brokers, the Central Listing Agreement required a commission of 10% of the gross sales price of the vessel, which would include the commission paid to the buyer's broker.

121.    By a PSA dated July 21, 2020 (closing on August 10, 2020), Plaintiff sold the Sea Ray for a purchase price of $120,000.

122.    Plaintiff paid a $12,000 commission in the transaction, including the commission to the buyer's broker, Thomas Keener.

123.    Carmine Galati, Jr., who is an owner of Galati and a Galati sales representative, as well as a Certified Professional Yacht Broker under the CPYB standards, is a member of IYBA's Board of Directors.

124.    Thomas Keener, the buyer's broker, is also an IYBA member and bound by IYBA rules.

125.    But for Defendants' anticompetitive conduct, Plaintiff would have been able to secure the services of a seller broker with a lower commission rate, would not have paid buyer's broker's commission and would have paid an overall lower commission rate.

126.    As part of the transaction, Plaintiff was damaged by paying an inflated commission rate of 10% of the sales price.  Absent the conspiracy among Defendants, Plaintiff would not have been forced to pay an inflated commission rate.

**Class Action Allegations**

127.    Plaintiff brings this action on behalf of himself, and as a class action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of the members of the Class defined as:

- 33 -

Case No. _____ -Civ-_____

> All persons in the United States who, from March 22, 2020, through the present, used a listing broker affiliated with any Defendant Brokerage companies in the sale of a pre-owned boat or yacht listed on a MLS, and who paid a commission to the buyer's broker in connection with the sale of the vessel.

128.    Excluded from the Class are Defendants, their officers, directors and employees; any entity in which Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant.  Also excluded from the Class are any judicial officer(s) presiding over this action and the members of his/her/their immediate family and judicial staff, jurors, and Plaintiff's counsel and employees of their law firms.

129.    The Class is readily ascertainable because records of the relevant transactions should exist.

130.    Class members are so numerous that individual joinder of all its members is impracticable.  Due to the nature of the trade and commerce involved, Plaintiff believes that the Class have many thousands of members, the exact number and their identities being known to Defendants and their co-conspirators.

131.    Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class.

132.    Common questions of law and fact exist as to all members of the Class and predominate over any question affecting only individual Class members.  These common legal and factual questions, each of which also may be certified under Rule 23(c)(4), include but are not limited to the following:

(a)    Whether Defendants engaged in the alleged conspiracy;

Case No. _____ -Civ-_____

(b)     Whether the conduct of Defendants' and their co-conspirators caused injury to the business or property of Plaintiff and the other members of the Class;

(c)     Whether the effect of Defendants' conspiracy was to inflate both total commissions and buyer broker commissions;

(d)     Whether the competitive harm from the conspiracy substantially outweighs any competitive benefits;

(e)     Whether Plaintiff and the other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such injunctive relief;

(f)     Whether Defendants' conduct is unlawful; and

(g)     The appropriate class-wide measures of damages.

133.    Plaintiff's claim is typical of the claims of the members of the Class because Plaintiff's claim arises from the same course of conduct by Defendants and the relief sought within the Class is common to each member.

134.    Plaintiff has retained counsel competent and experienced in the prosecution of antitrust class action litigation to represent themselves and the Class.  Together Plaintiff and its counsel intend to prosecute this action vigorously for the benefit of the Class.  The interests of Class members will be fairly and adequately protected by Plaintiff and its counsel.

135.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The prosecution of separate actions by individual members of the Class would impose heavy burdens on the Court and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort, and expense,

Case No. _____ -Civ-_____

and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.  Absent a class action, it would not be feasible for the members of the Class to seek redress for the violations of law alleged herein.

136.    Additionally, the Class may be certified under Rules 23(b)(1) and/or (b)(2) because:

(a)    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

(b)    The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudication, or substantially impair or impede their ability to protect their interests; and/or

(c)    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

**Antitrust Injury**

137.    Plaintiff and Class members have been injured in their business or property by reason of Defendants' antitrust violations.  Their injury consists of paying higher prices for yacht broker commissions than they would have paid in the absence of those violations.  These injuries will continue unless halted.

138.    Defendants' anticompetitive agreements and conduct have had the following effects, among others:

Case No. _____ -Civ-_____

- Sellers of residential property have been made to pay inflated costs to sell their vessels because Defendants' rules and practices require them to pay commissions to buyer brokers;

- Boat and yacht sellers have been forced to set buyers' brokers' commissions to induce buyers' brokers' to show the sellers' vessels to prospective buyers;

- Price competition has been restrained, both among buyers' brokers and among sellers' brokers; and

- the Broker Defendants have inflated their profits through artificially increased total commissions and increased buyer broker commissions.

139.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the Class have sustained injury to their business or property, have paid higher total commissions than they would have paid in the absence of Defendants' anticompetitive conspiracy, and have suffered damages as a result.

140.    There are no pro-competitive effects of Defendants' conspiracy that are not substantially outweighed by the conspiracy's anticompetitive effects.

141.    Significant economic evidence supports concluding that Defendants' conspiracy has resulted in Plaintiffs and the Class paying buyer broker commissions and total commissions that have been inflated to a supracompetitive level.

142.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## CLAIMS FOR RELIEF

## COUNT I

### (Violation of §1 of the Sherman Antitrust Act, 15 U.SC. §1)

143.    Plaintiff hereby repeats and incorporates by reference paragraphs 1 through 142 as though fully set forth herein.

Case No. _____ -Civ-_____

144.    Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of §1 of the Sherman Antitrust Act, 15 U.S.C. §1.

145.    The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Defendants to: (i) require yacht sellers to pay artificially inflated broker commissions and to eliminate competition; (ii) preclude price competition for broker commissions by agreeing to split commissions in Central Listing Agreements between the seller's broker and the buyer's broker; and (iii) require yacht sellers to pay artificially inflated total commissions.

146.    In furtherance of the contract, combination, or conspiracy, Defendants have committed one or more of the following overt acts: (i) participated in the establishment, implementation, and enforcement of the anticompetitive rules of the YBAA and the IYBA and other yacht broker associations, including, but not limited to, required payment by sellers of commissions to the buyer's broker; (ii) participated in the establishment, implementation, and enforcement of the anticompetitive rules of YATCO and YachtWorld, including, but not limited to, the required payment by sellers of commissions to the buyer's broker; and (iii) included provisions in the policy manuals and other corporate agreements that require their brokers to comply with the Code of Conduct of the YBAA and IYBA, and other yacht broker associations, and abide by and enforce the  requirement that sellers pay commissions to the buyer's broker.

147.    Defendants have required Sellers to pay an inflated broker commission and/or inflated total commission, and have restrained broker price competition/negotiation.  This harm to competition substantially outweighs any competitive benefits.

Case No. _____ -Civ-_____

148.    Defendants' unlawful agreements and/or conspiracy have caused broker commissions and/or total commissions to be inflated.  Plaintiff and the other members of the Class paid these inflated commissions during (and before) the last four years in connection with the sale of yachts by Broker Defendants.

149.    Absent Defendants' unlawful agreement(s) or conspiracy, Plaintiff and the other Class members would have paid substantially lower commissions because the broker representing the Buyer would have been paid by the Buyer (and buyer-broker commissions would not be at supracompetitive levels).

150.    Defendants' unlawful agreement(s) and/or conspiracy constitute a *per se* violation of §1 of the Sherman Antitrust Act, 15 U.S.C. §1, because it fixes, raises, maintains and/or stabilizes broker commissions.  Alternatively, Defendants' agreements are unlawful under the Rule of Reason as the procompetitive benefits of their actions are outweighed by the anticompetitive effects.

151.    As a direct and proximate result of Defendants' past and continuing violation of §1 of the Sherman Antitrust Act, 15 U.S.C. §1,  Plaintiff and the other Class members have been injured in their business and property and suffered damages in an amount to be proven at trial.

**COUNT II**

**(Declaratory and Injunctive Relief for Violation of §1 of the Sherman Antitrust Act, 15 U.S.C. §1and §16 of the Clayton Act, 15 U.S.C. §26)**

152.    Plaintiff hereby repeats and incorporates by reference paragraphs 1 through 151 as though fully set forth herein.

153.    Plaintiff seeks declaratory and injunctive relief under federal antitrust laws.

Case No. _____ -Civ-_____

154.    As set forth in Count I, Defendants have violated §1 of the Sherman Antitrust Act, 15 U.S.C. §1.

155.    Plaintiff and Class members have been injured in their business or property by reason of Defendants' antitrust violations.  Their injury consists of paying inflated commissions tobuyer brokers  and paying higher total prices for yacht broker commissions than they would have paid in the absence of those violations.  These injuries will continue unless halted.

156.    Plaintiff and Class members, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. §2201(a), hereby seek a declaratory judgment that Defendants' conduct constitutes a violation of §1 of the Sherman Antitrust Act, 15 U.S.C. §1.

157.    Plaintiff and Class members further seek equitable and injunctive relief pursuant to §16 of the Clayton Act, 15 U.S.C. §26, and other applicable law, to correct the anticompetitive effects caused by Defendants' unlawful conduct and to restore competition in the yacht commission market.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the proposed Class, pray for judgment against Defendants as to each and every claim made herein and for the following relief:

A.    That the Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

B.    That the Court enter an Order declaring that Defendants' actions, as set forth in this Complaint, violate the law;

Case No. _____ -Civ-_____

C.      That the Court award Plaintiff and the other Class members damages and/or restitution in an amount to be determined at trial;

D.      That the Court award Plaintiff and class members pre- and post-judgment interest;

E.      That the Court award Plaintiff and class members their costs of suit, including reasonable attorneys' fees and expenses;

F.      That the Court award Plaintiff and the Class a permanent injunction, under §16 of the Clayton Act, 15 U.S.C. §26, enjoining Defendants from continuing conduct determined to be unlawful; and

G.      That the Court award such other relief as it may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff, on behalf of himself and all others similarly situated, hereby demands a jury trial of all issues so triable.

DATED: March 22, 2024            ROBBINS GELLER RUDMAN
                                    & DOWD LLP
                                 PAUL J. GELLER
                                 Florida Bar No. 984795
                                 MARK J. DEARMAN
                                 Florida Bar No. 982407
                                 STUART A. DAVIDSON
                                 Florida Bar No. 0084824


                                        s/ Mark J. Dearman
                                 _____
                                    MARK J. DEARMAN

                                 225 NE Mizner Boulevard, Suite 720
                                 Boca Raton, FL  33432
                                 Telephone:  561/750-3000
                                 561/750-3364 (fax)
                                 pgeller@rgrdlaw.com
                                 mdearman@rgrdlaw.com
                                 sdavidson@rgrdlaw.com

Case No. _____ -Civ-_____

ROBBINS GELLER RUDMAN
  &amp; DOWD LLP
DAVID W. MITCHELL
ARTHUR L. SHINGLER III
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
davidm@rgrdlaw.com
ashingler@rgrdlaw.com

WITES & ROGERS, P.A.
MARC A. WITES
Florida Bar No. 24783
THOMAS B. ROGERS
Florida Bar No. 54680
4400 North Federal Highway
Lighthouse Point, FL  33064
Telephone:  954/933-4400
954/354-0205(fax)
mwites@witeslaw.com
trogers@witeslaw.com

Attorneys for Plaintiff